UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | | |
|---|---|---|
| SHENETRA FRANKLIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| ASPEN AEROGELS, INC. | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Shenetra Franklin ("Plaintiff"), by and through her undersigned counsel, brings this Original Complaint against Aspen Aerogels, Inc. ("Defendant") and alleges as follows:

### I.    INTRODUCTION

1.    This is an action for damages and other legal and equitable relief for (a) disability discrimination and retaliation under the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101, et seq.; (b) retaliation and interference under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.; and (c) retaliation under Massachusetts Paid Family and Medical Leave Act ("PFMLA"), M.G.L. c. 175M.

2.    During the term of Plaintiff's employment with Defendant, Plaintiff was diagnosed with disabling mental health conditions. Plaintiff complains that Defendant intentionally discriminated against Plaintiff on the basis of her disability, retaliated against Plaintiff for taking medical leave, failed to engage in the interactive process under the ADA, refused to provide reasonable accommodations to Plaintiff, and unlawfully terminated Plaintiff's employment.

### II.    JURISDICTION AND VENUE

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

4.      The Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 as Plaintiff's state law claim is so related to Plaintiff's federal claims that it forms part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claim were directed from this district and Defendant resides in this district.

### III.    PARTIES

6.      Plaintiff Shenetra Franklin is an individual residing in Mansfield, Texas, and was employed at all relevant times by Defendant.

7.      Defendant Aspen Aerogels, Inc. is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business located at 30 Forbes Road, Building B, Northborough, Massachusetts 01532. Defendant operates in the Boston division and maintains a facility at 870 Donald Lynch Blvd, Marlborough, Massachusetts 01752. Defendant may be served with process through its registered agent for service, Corporation Service Company, 84 State Street, Boston, Massachusetts 02109. Defendant is an employer within the meaning of the ADA and employs more than fifteen (15) employees. Further, Defendant is subject to the provisions of FMLA and PFMLA.

### IV.    FACTUAL ALLEGATIONS

8.      Plaintiff was employed by Defendant as a Legal Operations Manager in Defendant's Legal, Compliance, and Regulatory ("LCR") Department from July 18, 2022, until her termination on or about October 16, 2023.

9.      Plaintiff was a "hybrid" employee and worked remotely and on-site at Aspen's corporate headquarters in the Commonwealth of Massachusetts.

10.     During her employment with Defendant, Plaintiff reported to Defendant's Chief Legal Officer, Virginia Johnson ("Johnson"). Johnson controlled and directed Plaintiff's work from the Commonwealth of Massachusetts, where Johnson and many of Plaintiff's colleagues in the LCR Department lived and worked.

11.     Defendant had hired Johnson a few months before Johnson hired Plaintiff, and Johnson, as the new head of the LCR Department, sought to create a new Legal Operations system and team. Prior to Plaintiff's hire, Defendant did not have dedicated Legal Operations employees or a robust set of tools and materials required for effective Legal Operations management.

12.     Defendant initially interviewed Plaintiff for the role of Legal Operations Analyst. While interviewing for the Legal Operations Analyst position, Plaintiff understood that the role was newly created and that she would be responsible for certain tasks within the realm of budgeting and financial management, vendor and contract management, legal technology and systems implementation, process improvement, reporting, and leading/supporting legal team projects.

13.     During Plaintiff's interview with Johnson, Plaintiff and Johnson discussed how the Legal Operations objectives Johnson sought to achieve were not feasible if Plaintiff was to be the only Legal Operations employee. Plaintiff advised Johnson that Plaintiff would have to build a team of Legal Operations employees to accomplish Legal Operations objectives, and Johnson agreed. Plaintiff's title was updated to "Legal Operations Manager," reflecting their agreement that Plaintiff would later create a team of Legal Operations employees that Plaintiff would manage.

14.     Plaintiff was a dutiful employee who had numerous objective successes while employed as the Legal Operations Manager. Plaintiff's professional accomplishments included

developing Defendant's foundational reporting presentations for commercial contracting metrics and legal spending. Plaintiff's work enabled Defendant to allocate the department's workload, streamline processes, drive efficiency, and assist with budget planning, which resulted in substantial cost savings. Plaintiff also implemented major legal technology systems for contract lifecycle management and electronic billing.

15.    However, throughout Plaintiff's employment, Johnson continuously expanded the scope of Plaintiff's workload, assigned her additional tasks, and frequently imposed unreasonable completion deadlines. For example, at the time of Plaintiff's hire, Defendant's commercial/regulatory attorney was responsible for handling approximately 100% of Defendant's commercial contract review requests. Following Plaintiff's implementation of the contract lifecycle management system, commercial contract review requests grew by 300%, and Johnson insisted that Plaintiff take on roughly one-third of the work that was supposed to be completed by Defendant's commercial/regulatory attorney. Johnson frequently shifted work to Plaintiff, a non-attorney, that Defendant's attorneys simply did not want to do. Johnson would also volunteer Plaintiff to handle administrative work for other departments.

16.    The workload and unreasonable completion deadlines Johnson imposed on Plaintiff frequently required Plaintiff to work longer hours than her LCR Department colleagues, including during nights, weekends, holidays, and personal vacations. Plaintiff observed that her colleagues enjoyed a great work-life balance and ordinary 40-hour workweeks while Johnson continued to shift the work of Plaintiff's colleagues to Plaintiff. Consequently, Plaintiff regularly worked more than sixty (60) hours per week.

17.    Neither the job description for the role of Legal Operations Analyst/Manager nor Plaintiff's pre-employment interview with Johnson informed Plaintiff that the role required Plaintiff to work more than sixty (60) hours per week.

18.    Plaintiff frequently alerted Johnson to the fact that Plaintiff's workload was unmanageable. Johnson would occasionally attempt to pacify Plaintiff with empty promises of working together to find solutions, but no such solutions were found. At one point, Johnson told Plaintiff that she did not care how many hours Plaintiff had to work; she just wanted the work done.

19.    Instead of acting on Plaintiff's repeated requests to hire more Legal Operations resources, Johnson continued to add more to Plaintiff's plate and would then criticize Plaintiff for her inability to do what was, functionally, the work of three employees.

20.    Johnson singled Plaintiff out in front of her colleagues and treated Plaintiff differently than Plaintiff's colleagues. For example, Johnson required Plaintiff to present certain assignments in front of a four-attorney panel that would give Plaintiff feedback in a manner that felt demeaning and unjustifiably critical to Plaintiff. Plaintiff's colleagues were not given feedback on their work in Plaintiff's presence, and Johnson denied Plaintiff's request for one-on-one feedback sessions. As a result, Plaintiff began to have panic attacks prior to meetings with Johnson and other attorneys.

21.    Johnson was not the only LCR Department employee with knowledge of Plaintiff's workload. During a meeting with the commercial/regulatory attorney, Plaintiff informed him that she had not been to sleep since the day prior and had worked for nearly twenty-four hours straight.

22.    Plaintiff's workload was not par for the course in Defendant's business. When Plaintiff disclosed to a marketing manager that she had worked all night to complete an assignment,

the marketing manager informed Plaintiff that "there is absolutely no work at [Defendant] that should require any employee to have to work overnight."

23.    By August 2023, Plaintiff was having panic attacks on a weekly basis. Plaintiff's physical health began to deteriorate as well, as Plaintiff began to experience chest pain, back pain, and migraines.

24.    Upon information and belief, Plaintiff initially drew Johnson's ire because Plaintiff, though her suggestion on what the LCR department needed in terms of staffing, dared to suggest changes needed to be made to the Legal Operations environment and exposed inefficiencies in how Johnson ran her department. Prior to Plaintiff's termination, Plaintiff was aware of Johnson's cruel treatment of a former Compliance Manager whom Johnson framed as an underperformer after the former Compliance Manager dared to complain to others, including Plaintiff, about Johnson's leadership and treatment.

25.    Johnson's actions and treatment of Plaintiff had a severe, negative impact on Plaintiff's mental health and drove Plaintiff to have a complete mental breakdown. During her employment, Plaintiff was diagnosed with several mental health disorders, including but not limited to Major Depressive Disorder (recurrent/severe), Generalized Anxiety Disorder, Acute Stress Disorder, and Chronic Post-Traumatic Stress Disorder.

26.    Plaintiff's medical providers observed that Plaintiff's symptoms included heightened anxiety, apprehension, persistent sadness, intense fear, discomfort, irritability, excessive worrying, mood swings, loss of interest, agitation, low energy, excessive crying, sleeplessness, irritability, restlessness, isolation, and fatigue. Plaintiff's mental health conditions had an impact on her ability to function and caused a lack of concentration and sluggish cognitive tempo.

27.     Plaintiff sought medical treatment on or about August 30, 2023. As a result of her mental health conditions, Plaintiff required time off from work. On or about September 1, 2023, Plaintiff notified Defendant's Human Resources representative that she desired to take a leave of absence under the Family and Medical Leave Act ("FMLA").

28.     In response to Plaintiff's request, Defendant mailed an FMLA information packet to Plaintiff, and emailed to Plaintiff an "FMLA form" that Plaintiff could provide to her medical provider. The "FMLA form" Defendant provided to Plaintiff was Form WH-380-E, *Certification of Health Provider for Employee's Serious Health Condition under the Family and Medical Leave Act*. Defendant did not provide Plaintiff with notice of any of her rights under the PFMLA.

29.     Plaintiff's medical provider executed Form WH-380-E. Plaintiff's medical provider initially estimated that Plaintiff's leave would run through September 24, 2023. However, due to the side effects of medication prescribed to Plaintiff to manage her symptoms, Plaintiff's medical provider later extended Plaintiff's leave through October 9, 2023.

30.     On September 25, 2023, Defendant emailed Plaintiff and stated, "Your FMLA has been approved." At no point did Defendant notify Plaintiff that Defendant did not consider Plaintiff eligible for FMLA benefits due to the (primarily) remote nature of Plaintiff's work for Defendant.

31.     While communicating with Defendant's Human Resources department regarding her diagnosis, Plaintiff requested that her medical conditions and information not be shared with anyone in the LCR Department, as she feared her mental health struggles would not be taken seriously and that she would face retaliation for taking a leave of absence to deal with those struggles. Defendant's Human Resources representative assured Plaintiff that her medical information would be kept in the "strictest of confidentiality."

PLAINTIFF'S ORIGINAL COMPLAINT                                                    7

32.    During Plaintiff's medical leave, Defendant frequently contacted Plaintiff regarding work-related tasks and continued to send Plaintiff work to complete. It became apparent to Plaintiff that Plaintiff's work was not redistributed to other employees, and a mountain of work awaited Plaintiff upon her return from medical leave.

33.    In accordance with the ADA, Plaintiff attempted to engage in the interactive process with Defendant to determine the scope of reasonable accommodations that Defendant could provide that would enable Plaintiff to protect her mental health from deterioration once she returned to work.

34.    Unequivocally, Plaintiff believed she could perform all essential functions of her job as Legal Operations Manager without accommodations. However, Plaintiff requested reasonable accommodations to enable Plaintiff to perform the essential functions of her job without added difficulty and mental pain, to manage the cognitive effects caused by her medication, and to prevent further deterioration of her mental health.

35.    Because Plaintiff's mental health challenges were caused by Johnson's untenable demands and unequal treatment compared to Plaintiff's colleagues, and Plaintiff knew that she would be inundated with past due and new work upon her return, Plaintiff requested accommodations that sought to temporarily lessen the burden of that work and would protect Plaintiff's mental health upon her return.

36.    While on medical leave, on September 20, 2023, Plaintiff provided Defendant's Human Resources representative with a written request for reasonable accommodations. Specifically, Plaintiff requested:

   a. *"Feedback on work performance or work product to be communicated privately via email and/or during one-on-one meetings."*

b. *"Bi-weekly one-on-one meetings with supervisor to discuss prioritization of workload, progress on major reporting and projects, and any bi-lateral feedback or concerns."*

c. *"Provide more time to attend to work requiring attention to detail with reasonable deadlines that consider the totality of the current workload."*

d. *"Support of management with particularly challenging work relationships."*

e. *"Removal of any non-essential tasks and functions of the job providing for reasonable time to catch up on the backlog of email and work, and any missed or upcoming deadlines due to medical leave."*

f. *"During the early stages of the return to work, where possible, avoid assigning any urgent tasks that require immediate attention or have deadlines within one week; or provide sufficient resources to effectively meet those deadlines."*

g. *"Ensure a reasonable and balanced workload which enables effective workload management and the ability to complete allocated work in such a manner that does not require work to be performed more than 40 hours per week or outside of working hours."*

37. Plaintiff's letter also requested that Defendant engage in the interactive process to explore potential alternative accommodations should Defendant be unable to provide the specific accommodations Plaintiff requested.

38. In response, Defendant's Human Resources representative admitted to Plaintiff that she had no experience in assessing a reasonable accommodations request and would "get back" to Plaintiff about her request for accommodations. However, Defendant did not have any substantive

PLAINTIFF'S ORIGINAL COMPLAINT                                                        9

communications with Plaintiff regarding her request for accommodations while Plaintiff was on medical leave.

39.     Plaintiff exchanged emails with Johnson on September 23, 2023, in which Plaintiff advised Johnson that Plaintiff's return to work date had been extended to October 9, 2023, and that Plaintiff submitted an accommodations request to Defendant's Human Resources department.

40.     When Plaintiff returned to work on October 10, 2023, she was met with 627 unread emails. Plaintiff worked until approximately 2:22 pm, at which time she received an instruction to stop working.

41.     Defendant's Human Resources representative instructed Plaintiff to stop working until Plaintiff provided a doctor's note specifying the capacity in which Plaintiff was released to return to work, such as full capacity/full time.

42.     Plaintiff obtained a return to work letter from her medical provider that same day, and Defendant received a copy of it by 7:00 pm.

43.     In this letter, Plaintiff's medical provider opined that Plaintiff's condition met the ADA's definition of a "disability," as she has a physical or mental impairment that substantially limits one or more major life activities. Plaintiff's medical provider recommended accommodations in the form of restructuring of work expectations, bi-monthly time off for therapy sessions, and up to five days off during episodic flare-ups.

44.     On October 11, 2023, Plaintiff began her workday at 9:00 am. Just before 11:00 am, Defendant's Human Resources representative notified Plaintiff that she could not work until the "accommodation process" was finished. Plaintiff requested to know how soon Defendant would have a response to her return to work letter, as Plaintiff was ready to continue working and had much work to catch up on.

45.     On the morning of October 12, 2023, Plaintiff worked for approximately one hour until Defendant's Human Resources representative contacted Plaintiff and instructed her to stop working. In response, Plaintiff requested additional information from Defendant's Human Resources representative on Defendant's ability to accommodate Plaintiff's reasonable requests, noting that Defendant had not been transparent and simply demanded that Plaintiff stop working. Plaintiff believed she was fully capable of performing the essential functions of her job.

46.     It appeared to Plaintiff that the stop work instruction was due to Defendant's requirement that Plaintiff's medical provider execute a different form concerning Plaintiff's disability. On October 12, 2023, Plaintiff's medical provider notified Plaintiff that Defendant contacted Plaintiff's medical provider and requested that the medical provider complete a specific certification form regarding Plaintiff's disability and need for certain accommodations such as "restructured work expectations."

47.     Plaintiff's medical provider executed and returned the form the same day, which confirmed Plaintiff's disability and informed Defendant of the "restructured work expectations" Plaintiff required, which were the accommodations requested in Plaintiff's letter dated September 20, 2023.

48.     The form required Plaintiff to specify whether her limitations were "Permanent," "Temporary," or "Unknown." Plaintiff marked her limitations as "Temporary," reasonably indicating to Defendant that the requested accommodations were not intended to be permanent.

49.     Surprisingly, Johnson did not attempt to communicate with Plaintiff after acknowledging Plaintiff's return to work on October 10, 2023.  However, on October 12, 2023, Plaintiff noticed that Johnson had canceled all meetings scheduled with Plaintiff through the end of the year.

PLAINTIFF'S ORIGINAL COMPLAINT                                                                11

50.     On October 13, 2023, Plaintiff began work and received another call from Defendant's Human Resources representative. Defendant's Human Resources representative instructed Plaintiff that she could work that day but "not too hard." Plaintiff completed a full day of work.

51.     On October 16, 2023, Defendant's Human Resources representative contacted Plaintiff and stated Defendant did not agree with the accommodations Plaintiff requested and that Plaintiff could continue working for Defendant so long as she agreed to do so without any accommodations. Plaintiff sought to understand why Defendant disagreed with her requests, but Defendant's representative refused to offer any explanation or alternative accommodations. Instead, Defendant's representative asked Plaintiff how long she would need her requested accommodations, and Plaintiff stated that two weeks would suffice so that Plaintiff could get caught up on a backlog of work. Defendant's representative then informed Plaintiff that she would call Plaintiff later that day and ended the call.

52.     Defendant's representative contacted Plaintiff later that afternoon, reiterating that Defendant did not agree with Plaintiff's requested accommodations and, again, did not offer any explanation or propose alternative accommodations. Defendant's representative also informed Plaintiff that she was being terminated, just six days after Plaintiff returned from medical leave.

53.     Despite Plaintiff's efforts to engage in the interactive process, Defendant failed to meaningfully consider Plaintiff's requests for accommodation or participate in the interactive process. Defendant never explained to Plaintiff why Defendant thought her requests were unreasonable, nor did Defendant propose alternative accommodations.

54.     Instead of working with Plaintiff to find an agreeable solution to prevent the deterioration of Plaintiff's medical conditions, Defendant, on or about October 16, 2023,

PLAINTIFF'S ORIGINAL COMPLAINT                                                                                    12

unlawfully terminated Plaintiff's employment, citing disagreement with Plaintiff's requested accommodations.

55. During discussions between Plaintiff and Defendant regarding Plaintiff's termination, Defendant never claimed that Plaintiff was terminated for alleged performance issues or an inability to perform the essential functions of her job.

56. In fact, in March of 2023, Plaintiff received a positive annual performance review and a merit-based raise in her compensation. Plaintiff also received restricted stock units and stock options due to her strong performance contributions.

57. Prior to Plaintiff's medical leave, the professional relationship between Johnson and Plaintiff was not without its communication challenges. However, at no point prior to Plaintiff's medical leave did Johnson advise or imply to Plaintiff that her work quality was below expectations or that her position as Legal Operations Manager was in jeopardy.

58. Johnson's actions suggest just the opposite – that despite communication challenges between Johnson and Plaintiff, Johnson intended to continue working with Plaintiff. One week prior to Plaintiff's medical leave, Johnson and Plaintiff made plans for Plaintiff to attend a legal operations conference in late September 2023. Also, during Plaintiff's medical leave, Johnson advised Plaintiff to update her email signature to reflect the company's new address.

59. On October 10, 2023, the day Plaintiff returned from medical leave, Johnson emailed Plaintiff at 10:08 am to advise that although Johnson was traveling, she would "find time to schedule a call amidst [her] travels to review prioritization, key projects and next steps."

60. As of the morning of October 10, 2023, Johnson's actions demonstrated an intent to continue working with Plaintiff. However, that appeared to change following Defendant's

PLAINTIFF'S ORIGINAL COMPLAINT                                                              13

assessment of Plaintiff's requested accommodations and stop-work instruction, which came later that day at approximately 2:22 pm.

61.    At the time of her termination, Plaintiff was capable of performing the essential functions of her position without reasonable accommodations.

62.    Plaintiff's requested accommodations, which sought to manage the secondary impacts of her mental health conditions, were reasonable. Plaintiff advised Defendant's Human Resources representative that her accommodations would last for just *two weeks* and were needed so that Plaintiff could get caught up on five and a half weeks' worth of emails and past due projects, as well as work on tasks with upcoming deadlines.

63.    Further, Defendant's actions demonstrate a blatant lack of respect for Plaintiff's medical conditions and privacy. Defendant represented to Plaintiff that her medical information would be kept strictly confidential. However, upon information and belief, it appears someone in Defendant's Human Resources department disclosed Plaintiff's confidential medical information, as an attorney in the LCR Department who was not Plaintiff's supervisor made an unsolicited comment to Plaintiff upon her return to work about her "stress," suggesting he knew the reason she took medical leave.

64.    During the term of Plaintiff's employment, Defendant availed itself of the protections of the laws of the Commonwealth of Massachusetts with respect to the services provided by Plaintiff.

65.    In connection with Plaintiff's hire, Plaintiff signed a Confidentiality Agreement. Defendant's Confidentiality Agreement noted that "[Defendant] is based in the Commonwealth of Massachusetts, U.S.A. and requires uniformity and consistency in the laws under which it deals with all of its business[.]" Defendant designated the Commonwealth of Massachusetts as its choice

of law and venue for any disputes arising out of the Confidentiality Agreement and noted the Agreement would be construed as if "wholly-performed within the Commonwealth of Massachusetts."

66.    However, in connection with Plaintiff's hire, Defendant failed to provide Plaintiff with notice of *her* rights under Massachusetts law—the PFMLA—in violation of Mass. Gen. Laws ch. 175M, § 4, and failed to deduct statutorily required premiums, in violation of Mass. Gen. Laws ch. 175M, § 6.

67.    Defendant's actions have caused Plaintiff to experience severe financial and emotional losses. Since her unlawful termination, Plaintiff's life has been significantly impacted in the following ways:

    a.    Plaintiff, a single mother of three, lost her health insurance coverage and now faces substantial unpaid medical bills resulting from medical emergencies.

    b.    Unable to afford mental health treatment, Plaintiff experienced a significant decline in her mental health and was forced to abruptly stop taking her prescribed medication.

    c.    Plaintiff suffered severe withdrawal symptoms as a result of abruptly discontinuing her mental health medication.

    d.    The deterioration of Plaintiff's mental health following her termination significantly hindered her job search and impaired her ability to perform effectively in job interviews. In the past year, Plaintiff submitted over 200 job applications and has not yet found comparable employment.

    e.    Unable to afford groceries, Plaintiff relied on the generosity of food banks until she was approved for public assistance food benefits.

f.   Due to her financial struggles following termination, Plaintiff was frequently late on rent payments, which caused her landlord to refuse to renew her lease for one-year terms. As a result, Plaintiff now lives on a month-to-month lease, constantly fearing the possibility of eviction.

g.   Plaintiff's utilities have been shut off many times over the past year.

h.   Plaintiff's credit has been destroyed.

i.   Plaintiff has borrowed money from family and friends to survive and has been unable to pay back all loans.

## V.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

68.    On January 9, 2024, Plaintiff filed a timely Charge of Discrimination with the Texas Workforce Commission, Civil Rights Division, which was cross-filed with the Equal Opportunity Employment Commission ("EEOC"). Plaintiff alleged discrimination on account of her disability.

69.    The EEOC issued a Notice of Right to Sue (the "Notice") on July 24, 2024, authorizing Plaintiff to file this Original Complaint prior to the expiration of the ninety-day deadline.

70.    This Original Complaint has been filed prior to the expiration of the deadline.

## VI.    COUNT I: Violation of the Americans with Disabilities Act – Intentional Discrimination

71.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

72.    Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff's mental health disorders substantially limit one or more major life activities, including

but not limited to slowing Plaintiff's cognitive tempo, which impacts Plaintiff's ability to work, concentrate, think, and communicate.

73.     Defendant was aware of Plaintiff's disability.

74.     Plaintiff was terminated as a direct result of her disability, her record of having a disability, and/or because Defendant regarded her as a person with a disability.

75.     By the above-described acts, Defendant discriminated against Plaintiff because of her disability or perceived disability. Defendant violated the ADA by terminating Plaintiff's employment because Plaintiff had a disability. Plaintiff's disability and/or Defendant's perception of Plaintiff as a person with a disability caused Defendant to terminate her.

76.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer substantial losses, including loss of earnings, benefits, emotional distress, and other damages.

77.     Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights.

## VII.     COUNT II: Violation of the Americans with Disabilities Act – Failure to Provide Reasonable Accommodations

78.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

79.     Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff's mental health disorders substantially limit one or more major life activities, including but not limited to slowing Plaintiff's cognitive tempo, which impacts Plaintiff's ability to work, concentrate, think, and communicate.

80.     Plaintiff was capable of performing the essential functions of her job without reasonable accommodations. An employee who can, with some difficulty, perform the essential

functions of her job without accommodation remains eligible to request and receive a reasonable accommodation. *Bell v. O'Reilly Auto Enters., LLC*, 972 F.3d 21, 24 (1st Cir. 2020).

81.    Although Plaintiff was capable of performing the essential functions of her job without reasonable accommodations, Plaintiff requested accommodations to manage the secondary impacts of her disability and prevent the worsening of her condition.

82.    Plaintiff informed Defendant of her disabilities and her request for reasonable accommodations. Defendant refused to provide any accommodation to Plaintiff and terminated her employment.

83.    Defendant's failure to accommodate Plaintiff's disability is an unlawful act of discrimination under the ADA.

84.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer substantial losses, including loss of earnings, benefits, emotional distress, and other damages.

85.    Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights.

## VIII.    COUNT III: Violation of the Americans with Disabilities Act – Failure to Accommodate By Failing to Engage in the Interactive Process

86.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

87.    Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff's mental health disorders substantially limit one or more major life activities, including but not limited to slowing Plaintiff's cognitive tempo, which impacts Plaintiff's ability to work, concentrate, think, and communicate.

88.    Plaintiff was capable of performing the essential functions of her job without reasonable accommodations.

89.    Although Plaintiff was capable of performing the essential functions of her job without reasonable accommodations, Plaintiff requested accommodations to manage the secondary impacts of her disability and prevent the worsening of her condition.

90.    Plaintiff informed Defendant of her disabilities and her request for reasonable accommodations. Plaintiff attempted to engage Defendant in the interactive process as required under the ADA.

91.    Defendant failed to meaningfully engage in the interactive process and did not provide reasonable accommodations to Plaintiff.

92.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer substantial losses, including loss of earnings, benefits, emotional distress, and other damages.

93.    Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights.

## IX.    COUNT IV: Violation of the Americans with Disabilities Act - Retaliation

94.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

95.    Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff's mental health disorders substantially limit one or more major life activities, including but not limited to slowing Plaintiff's cognitive tempo, which impacts Plaintiff's ability to work, concentrate, think, and communicate.

96.     Plaintiff was qualified to perform the essential functions of her position without reasonable accommodation.

97.     Plaintiff notified Defendant of her disability and requested reasonable accommodations.

98.     Plaintiff's request for reasonable accommodations constituted protected activity under the ADA, which prohibits retaliation against an employee for exercising their rights under the ADA.

99.     Defendant, instead of providing the requested accommodations, terminated Plaintiff's employment just six days after she returned to work.

100.    Plaintiff's termination was motivated by retaliatory animus in response to Plaintiff's request for reasonable accommodations.

101.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer substantial losses, including loss of earnings, benefits, emotional distress, and other damages.

102.    Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights.

**X.      COUNT V: Violation of the Family and Medical Leave Act - Retaliation**

103.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

104.    Plaintiff is an employee who, at all relevant times, was eligible for FMLA leave.

105.    At the time of her FMLA leave, Plaintiff had been employed by Defendant for more than twelve months. Further, Plaintiff had more than 1,250 hours of service for Defendant during the twelve-month period immediately preceding her leave.

106.    Plaintiff assignments were made from Defendant's Marlborough office, where 50 or more employees were employed by Defendant within a 75-mile radius.

107.    Defendant is subject to the provisions of the FMLA.

108.    By providing Plaintiff with Form WH-380-E and approving Plaintiff's "FMLA" request, Defendant treated Plaintiff as eligible for benefits under FMLA.

109.    Plaintiff took medical leave on or about September 1, 2023, to October 9, 2023.

110.    Plaintiff returned to work on October 10, 2023.

111.    On October 16, 2023, just six days after returning from FMLA leave, Defendant notified Plaintiff that Defendant was terminating Plaintiff's employment. The termination was directly related to Plaintiff's exercise of rights under the FMLA, constituting retaliation.

112.    Defendant's decision to terminate Plaintiff was motivated by Plaintiff's use of FMLA leave and was intended to punish Plaintiff for exercising her rights under the FMLA.

113.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, benefits, and other compensatory damages, in an amount to be determined at trial.

## XI.    COUNT VI: Violation of the Family and Medical Leave Act - Interference

114.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

115.    Plaintiff is an employee who, at all relevant times, was eligible for FMLA leave.

116.    At the time of her FMLA leave, Plaintiff had been employed by Defendant for more than twelve months. Further, Plaintiff had more than 1,250 hours of service for Defendant during the twelve-month period immediately preceding her leave.

117.    Plaintiff assignments were made from Defendant's Marlborough office, where Defendant employed 50 or more employees within a 75-mile radius.

118.    Defendant is subject to the provisions of the FMLA.

119.    By providing Plaintiff with Form WH-380-E and approving Plaintiff's "FMLA" request, Defendant treated Plaintiff as eligible for benefits under FMLA.

120.    Plaintiff took medical leave on or about September 1, 2023, to October 9, 2023.

121.    After Plaintiff submitted a written request for leave under FMLA, Defendant notified Plaintiff in writing that her request had been approved. However, Defendant failed to provide Plaintiff with a Designation Notice that indicated Defendant would require Plaintiff to present a fitness-for-duty certification to be restored to employment.

122.    Plaintiff returned to work on October 10, 2023. Defendant instructed Plaintiff to cease working on October 10, 2023, October 11, 2023, and October 12, 2023.

123.    By instructing Plaintiff to cease working, Defendant unlawfully interfered with Plaintiff's right to reinstatement to the same position Plaintiff held when Plaintiff's leave commenced.

124.    By terminating Plaintiff's employment, Defendant unlawfully interfered with Plaintiff's right to reinstatement to the same position Plaintiff held when Plaintiff's leave commenced.

125.    As a direct and proximate result of Defendant's unlawful interference, Plaintiff has suffered damages, including but not limited to lost wages, benefits, and other compensatory damages, in an amount to be determined at trial.

**XII.    COUNT VII: Violation of the Massachusetts Paid Family and Medical Leave Act – Retaliation**

126.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

127.   Defendant, an employer based in the Commonwealth of Massachusetts, is subject to the provisions of the PFMLA.

128.   Plaintiff was eligible for medical leave under the PFMLA as Plaintiff was, at all relevant times, employed by Defendant. Plaintiff is a Covered Individual under the PFMLA as all her employment was with an employer in the Commonwealth of Massachusetts, and Plaintiff meets the earnings requirements of M.G.L. c. 151A,§ 24(a).

129.   Plaintiff was a hybrid employee whose employment was not localized to the state of her residence (Texas), nor was Texas Plaintiff's base of operations, as Defendant permitted Plaintiff to work wherever she pleased so long as she remained available to travel to the Commonwealth of Massachusetts upon Defendant's request.

130.   During her employment with Defendant, Plaintiff traveled to the Commonwealth of Massachusetts to perform services for Defendant.

131.   The services performed by Plaintiff in the Commonwealth of Massachusetts were not incidental to the services Plaintiff performed for Defendant while working outside of the Commonwealth of Massachusetts. While working in the Commonwealth of Massachusetts, Plaintiff performed services that were a regular and recurring part of the essential functions of her job.

132.   The services provided by Plaintiff were controlled in and/or directed from the Commonwealth of Massachusetts, where her immediate supervisor and Defendant's Chief Legal Officer, Virginia Johnson, lived and worked.

133.   Plaintiff took medical leave from September 1, 2023, to October 9, 2023.

134.   Plaintiff returned to work on October 10, 2023.

135.   On October 16, 2023, just six days after returning from medical leave, Defendant notified Plaintiff that Defendant was terminating Plaintiff's employment. Section 9(c) of Mass. Gen. Laws ch. 175M provides that any adverse action, such as termination, taken against an employee within six months of their return from leave is presumed to be retaliatory.

136.   As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including but not limited to lost wages, benefits, and other compensatory damages, in an amount to be determined at trial.

## XIII.   PRAYER FOR RELIEF

137.   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief:

a.   Declare that Defendant's actions violated the ADA and award Plaintiff:

  i.   compensatory damages, including back pay, front pay, and lost benefits.

  ii.   damages for emotional distress, mental anguish, and physical pain and suffering.

  iii.   punitive damages.

  iv.   attorney's fees and costs.

  v.   pre-judgment and post-judgment interest.

  vi.   such other and further relief as the Court deems just and proper.

b.   Declare that Defendant's actions violated the FMLA and award Plaintiff:

  i.   actual damages in an amount to be determined at trial.

  ii.   liquidated damages as permitted under the FMLA.

      iii.     attorney's fees and costs.

      iv.     pre-judgment and post-judgment interest.

      v.     such other and further relief as the Court deems just and proper.

  c.  Declare that Defendant's actions violated the PFMLA and award Plaintiff:

      i.     three times the amount of Plaintiff's lost wages.

      ii.     attorney's fees and costs.

      iii.     pre-judgment and post-judgment interest.

      iv.     such other and further relief as the Court deems just and proper.

## XIV.    JURY DEMAND

138.    Plaintiff demands a trial by jury on all issues so triable.


/s/ Alan D. Rose
Alan D. Rose (BBO # 427280)
Layth H. Hert (BBO # 713200)
ROSE LAW PARTNERS LLP
One Beacon Street, 23rd Floor
Boston, MA 02108
(617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
lhh@rose-law.net


**SUMNER LAW, LLP**

*/s/ Justin V. Sumner*
**Justin V. Sumner** *(pro hac vice forthcoming)*
State Bar No. 24063022
jsumner@sumnerlaw.com
**Amanda Bridson** *(pro hac vice forthcoming)*
State Bar No. 24092172
abridson@sumnerlaw.com

3006 Cole Avenue
Dallas, Texas 75204
Tel: 214-965-9229

PLAINTIFF'S ORIGINAL COMPLAINT                                                            25

Fax: 214-965-9215

**ATTORNEYS FOR PLAINTIFF**